UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LAZARO XIQUE CUATLE, ) | |
|     Plaintiff, ) | |
| ) | |
|     vs. ) | 1:09-cv-0820-RLY-TAB |
| ) | |
| OFFICER JOSE TORRES and SGT. ) | |
| KERRY BUCKNER, ) | |
|     Defendants. ) | |

**ENTRY ON PLAINTFF'S MOTION FOR LEAVE TO WITHDRAW
ADMISSIONS AND DEFENDANTS MOTION FOR SUMMARY JUDGMENT**

This matter stems from the July 3, 2007 arrest of Plaintiff, Lazaro Xique Cuatle, on a charge of murder following the death of a two-year-old girl. Plaintiff alleges that he was unlawfully arrested and maliciously prosecuted, leading to his imprisonment for more than a year before the state elected to drop the charges due to its belief that it had insufficient evidence to convict Plaintiff. Defendants, Jose Torres and Kerry Buckner, are members of the Indianapolis Metropolitan Police Department ("IMPD"). They maintain that there was probable cause for the arrest of Plaintiff on murder charges and that they are entitled to qualified immunity. They have moved the court for entry of summary judgment in their favor.

In addition to the Defendants' Motion for Summary Judgment (Docket # 108), Plaintiff's Motion For Leave To Withdraw Admissions (Docket # 112) is pending as well. Defendants served Requests For Admissions to Plaintiff, who failed to timely respond to

the requests, thus the admissions are deemed admitted pursuant to the Federal Rules of Civil Procedure. For the reasons explicated in this entry, Plaintiff's motion is granted, but the withdrawal of his admissions does not change the outcome with regard to Defendants' summary judgment motion, which is also granted.

**Factual Background**

During the evening of July 2, 2007, a social worker at St. Vincent Hospital contacted IMPD to inform the department that there was an injured child admitted to the emergency room under circumstances which raised questions as to the cause of the injuries. Two-year-old Vanesa Cervantes ("Vanesa") required emergency surgery due to severe head trauma which had caused swelling of the brain, and she expired during the course of the surgery. One of several officers to respond to the call from the hospital was Defendant, Detective Kerry Buckner. He was present at the hospital when an interview of the child's mother, Nayely Galicia ("Galicia"), was conducted in Spanish and she explained the circumstances that led to her bringing the child to the hospital.

Through an interpreter, Detective Buckner learned that Galacia had taken Vanesa to her babysitter's house that morning. The babysitter was Elena Cuatlacuatl ("Elena"), who Galicia understood lived in the apartment with a sister, brother-in-law and uncle. At approximately 6:00 p.m., Galicia received a phone call from Elena asking that she come pick up Vanesa, because Vanesa had been injured. When Galicia arrived at the

apartment, Elena was outside with Vanesa in her arms, unconscious.  Elena informed Galicia that Elena's two-year-old niece had pushed Vanesa, causing her to fall and hit her head against a bed frame.  Galicia then drove Vanesa and Elena to the hospital.  During that same interview, Galicia indicated that Vanesa had been acting somewhat "strange" during the past few weeks, and that on that particular morning she had not wanted to stay at the babysitter's apartment.

Detective Buckner spoke with several medical personnel while at the hospital.  He was informed that while they had not seen visible marks on Vanesa's head when she arrived at the hospital, there was still tremendous swelling.  The medical personnel informed Detective Buckner that Vanesa suffered a severe subdural hematoma, which ultimately resulted in her death.  He was also told that the significant swelling of Vanesa's brain and her injuries, as observed during surgery, did not seem consistent with a child falling and hitting her head on a bedframe.  A Field Deputy was dispatched to the hospital from the Coroner's office to complete an investigative report and the police officers left to obtain a search warrant to allow them to investigate the apartment where the incident had occurred.

When Detective Buckner arrived at the apartment he found a man on the front porch who identified himself as Julian Vasquez ("Vasquez").  Elena identified Vasquez as her uncle and a resident of the apartment, but it would later be learned that he was using that name as an alias and that his real name was Lazaro Cuatle, the Plaintiff, an

undocumented alien from Mexico, and Elena's boyfriend. Detective Buckner asked Plaintiff where he was at the time Vanesa was injured and Plaintiff responded that he had yet to arrive home from work that day. He informed Buckner that he worked at Carraba's restaurant in Carmel, Indiana and had been there until approximately 5:30 that day. Based on his own observations and training, Detective Buckner was convinced that Plaintiff was intoxicated when he spoke to him, which caused the Detective some suspicion. Later that evening, the detective was able to reach one of the owners of Carraba's who indicated that the Plaintiff had clocked in at work at 10:15 a.m., but was clocked out by one of the managers at 1:00 p.m., because Plaintiff had left earlier and not returned.

Detective Buckner's search of the apartment turned up no bed frames, only one headboard which was behind a mattress and leaning against the wall. The beds in the apartment were all just stacked mattresses and box springs. In an interview later that evening at the police station, Elena indicated to an interpreter that Vanesa had been pushed by another child and fell against a bed frame, but when the detective had the interpreter point out that there were no bed frames at the apartment, Elena responded that the child had fallen against the box spring. The fall occurred after Elena had fed Vanesa and taken her to Elena's bedroom to get her ready for a bath. Under further questioning, Elena confirmed that Plaintiff was not only in the house at the time of the injury, but asleep in the bedroom where she claimed that Vanesa had been pushed and fell. She also

confirmed that she had not dialed 911 following the incident, she only called the child's mother.

Bill Morris ("Deputy Morris"), the Field Deputy from the Coroner's Office, completed his investigative report at St. Vincent Hospital and provided it to Dr. Kent Harshbarger ("Dr. Harshbarger"), a forensic pathologist under contract with the Coroner's office, who performed an autopsy of Vanesa's body on the afternoon of July 3, 2007. The field report indicated that Galicia stated that Vanesa had been crying a great deal earlier that week and had wanted only milk instead of solid foods for her meals. However, according to Galicia, Vanesa had acted fine the day prior and played with her sister in the morning before being taken to the babysitter's apartment. Galicia reported that Vanesa seemed to like Elena and Galicia had confidence in Elena as a babysitter.

Deputy Morris indicated that Vanesa's injuries were a subdural hematoma with midline shift, a small nondepressed parietal fracture and he also noted that Dr. Judy Petts, the surgeon, reported to the deputy that Vanesa also had a "blown left pupil." Vanesa had a blood pressure as she went in for surgery, but as soon as the emergency craniotomy was started, she lost all vital signs. There were no visible signs of trauma on the body and she appeared to be an otherwise healthy two-year-old child. In following up with the police investigation at the scene of the incident, Deputy Morris noted in his report that there was only a headboard behind the mattress in the bedroom where the fall was said to have occurred and that there was some vomit on the mattress. The report also noted that it

5

appeared as though someone had attempted to clean-up the bed and the room.

On the afternoon of July 3, 2007, Detective Buckner attended the autopsy which was performed by Dr. Harshbarger. Also in attendance at the autopsy was a photographer and an autopsy assistant. Buckner provided the doctor with the information he had obtained from the interviews of Galicia and Elena.[1] The autopsy revealed swelling of the brain and contusions to the left frontal scalp, left to mid occipital scalp, bilateral front lobe, and left parietal lobe. Upon completion of the autopsy, Dr. Harshbarger concluded that there were no signs of natural disease or injury and that Vanesa's cause of death was "blunt force injuries to the head." Dr. Harshbarger informed Detective Buckner that the injuries he saw did not appear to be the result of a fall and he concluded in his report that the manner of death was "homicide."

With the results of the autopsy suggesting that Vanesa's death was no accident, Detective Buckner wanted to speak further with Elena and the Plaintiff. He obtained the assistance of Officer Jose Torres ("Officer Torres"), the other remaining Defendant in this lawsuit, to serve as an interpreter and assist in the questioning. They drove to the apartment and asked Elena, who was nearly nine months pregnant at the time, and the Plaintiff if they would accompany them to the police station for further interviews. Elena

---

[1] Affidavits from the photographer and autopsy assistant have been submitted by Defendants and they state that Detective Buckner made no attempts to persuade Dr. Harshbarger with regard to the cause of death of Vanesa. Plaintiff has suggested otherwise in pleadings and briefs, but he offers no evidence to confirm any such attempts at persuasion.

and the Plaintiff agreed to go with the police to answer further questions.

When they arrived at the station, Elena and the Plaintiff were placed in different rooms. Elena's interview was conducted first and, according to Detective Buckner, Plaintiff, who was in a room nearby, could periodically be heard shouting through the air ducts, but what he was saying was unintelligble.[2] Despite the fact that early in the interview she was told that the doctors had opined that Vanesa did not die as a result of a fall, for nearly 45 minutes Elena sat mostly silent, continuing to insist, when she did respond, that the child had been pushed and fell against a part of the bed. However, as time went on, she did admit that Plaintiff was her boyfriend and not her uncle and confirmed that he had come home around 4:00 on the day of the incident.

Officer Torres communicated several times to Elena that the police were confident that a fall was not what caused Vanesa's injuries and that Elena ran a grave risk of being found responsible if she did not indicate to them what had really occurred. Officer Torres indicated to Elena that, if she was found responsible, she could end up in jail and unable to be with her own soon to be born child. Torres made it clear that the police did not believe that she had done anything to Vanesa but suspected Plaintiff had injured the child

---

[2] A video tape of the interview was submitted by the Defendants in support of their motion and a transcript of that interview, with translation, has been submitted by the Plaintiff. While one can listen to the audio from the interview and hear some background noise that might possibly be a person shouting in another room, the quality of the recording is not such that the noise can be identified with any certainty.

in some manner. He continued to coax her to tell them the truth until Elena eventually did change her story, admitting that she was cooking a meal in the kitchen when she heard Vanesa cry out and, when she went to respond, she saw Plaintiff hit the child on top of the head. Later in the interview she stated that Plaintiff had hit the child multiple times. The interview lasted a total of approximately ninety minutes.

After concluding Elena's interview, the officers went to interview Plaintiff, but he declined to answer questions and immediately requested an attorney. Plaintiff was put under arrest for the murder of Vanesa later that evening. Detective Buckner drafted a probable cause affidavit on July 5, 2007, which he signed along with a representative from the prosecutor's office, and Plaintiff was formally charged with murder on July 9, 2007.

Detective Buckner has filed an affidavit in this case stating that Plaintiff's apparent intoxication and the changing stories from Plaintiff and Elena regarding who Plaintiff was and Plaintiff's inaccurate explanation of where he was at the time of the incident caused Buckner to be suspicious of the Plaintiff early on. He eventually determined there was probable cause for Plaintiff's arrest based upon all of the evidence that had been gathered, including but not limited to, the reports from medical personnel at the hospital indicating that the child was killed by a blunt force injury to the head which was not consistent with a simple fall. Similar statements were made by Dr. Harshbarger, who conducted the autopsy, and that doctor's conclusion that Vanesa's death was a homicide. While at the

apartment, Buckner saw that the only thing that might be referred to as a hard "frame" to the bed was a headboard leaning against the wall behind the mattress. He also learned that only two adults were present at the scene and they appeared to be the only persons who could have administered any serious blows to the child. Finally, Elena's admission that she saw Plaintiff hit the child, buttressed his belief that the Plaintiff had caused Vanesa's injuries and, ultimately, her death.

Elena gave birth to her and the Plaintiff's child just two days following Vanesa's death. Shortly thereafter, the Marion County Department of Child Services filed an action on behalf of the newborn in state court, naming the baby girl as a child in need of services ("CHINS"), based on information that Vanesa had been battered by Plaintiff while under the care of Elena, and naming Elena as the Respondent in that action. The baby was also removed from Elena's custody.

Elena eventually altered her version of the events which led to Vanessa's death, claiming that her original explanation of the events was accurate. She later went so far as to accuse the "authorities," including Officer Torres and officials at the Department of Child Services, of using her pregnancy and, after the birth, the custody of her newborn child as leverage to obtain favorable testimony from her against Plaintiff in connection with his arrest and prosecution for murder. She filed an affidavit making those accusations against the authorities in May 2005, in connection with the Plaintiff's criminal prosecution.

9

Additional evidence eventually led to the prosecutor's office dropping the charges against Plaintiff. In the summer of 2008, an expert pathologist hired by the defense team opined, after a review of the medical records, that while Vanesa had indeed died from a blunt force injury, the cause of death was accidental because it could well have been the result of a single fall. Also, in August 2008, the prosecutor's office received an assessment of Elena's mental health from her state caseworker, which indicated that Elena had been diagnosed with borderline mental functioning.

In response to the new evidence, in October 2008, the prosecutor's office retained an additional independent pathologist to review all the medical records. This third pathologist concurred that the child's death was a result of a blunt force trauma, but stated he would find the manner of death to be "undetermined" because he could not rule out either a fall or a blow to the head. Dr. Harshbarger was then contacted for further inquiry into his original conclusion. Dr. Harshbarger acknowledged that he could not completely rule out that Vanesa died as a result of a fall. In light of these new developments and new evidence, the prosecutor's office concluded that it was unlikely that the "beyond a reasonable doubt" standard necessary for a conviction could be met. The criminal charges against Plaintiff were dropped and he was deported to Mexico.

This lawsuit was filed by Plaintiff on July 2, 2009. He remains in Mexico and is represented in this litigation by the same attorney who represented him in the criminal proceedings. There were originally six Defendants named by Plaintiff in this lawsuit,

including Dr. Harshbarger and two individuals employed by the Department of Child Services. However, as a result of rulings on previous motions and the filing of an Amended Complaint, only Detective Buckner and Officer Torres remain as Defendants. Plaintiff invokes the constitutional protections of 42 U.S.C. § 1983 and asserts false arrest and malicious prosecution claims against Buckner and Torres. The two Defendants have moved the court for summary judgment, claiming that there was probable cause to arrest the Plaintiff and that they are entitled to qualified immunity.

**Summary Judgment Standard**

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party, however, may not rest on mere allegations or denials in its pleadings, but rather "must set forth specific facts showing that there is a genuine issue for trial ." Fed. R. Civ. P. 56(e).

A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby*,

*Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Factual disputes that are irrelevant or unnecessary to the claims before the court will not, by themselves, defeat a summary judgment motion. *Id*. at 247-48. When determining whether a genuine issue of material fact exists, the court views the record and all reasonable inferences in the light most favorable to the nonmoving party. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003).

Summary judgment is also proper, indeed it is mandated, when it is clear that the plaintiff will be unable to satisfy the legal requirements necessary to establish his case. *See Celotex*, 477 U.S. at 322. Under this scenario, "there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 323. The moving party is, therefore, entitled to judgment as a matter of law due to the nonmoving party's failure to make a sufficient showing on an essential element of which he carried the burden of proof. *Id*.

**Discussion**

The court looks first at Defendants' contention that Plaintiff has conceded that probable cause existed for his arrest. If probable cause existed for Plaintiff's arrest, he can not successfully maintain a Section 1983 action for false arrest. *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2007).

Defendants' contention that Plaintiff has conceded the issue of probable cause is founded on the Plaintiff's failure to timely respond to the Requests For Admissions served by Defendants pursuant to Rule 36 of the Federal Rules of Civil Procedure. One of those requests sought an admission from Plaintiff that there was probable cause for his arrest. Subsection (a)(3) of Rule 36 provides that without a response within thirty days of service, a properly served request for admission is deemed admitted. Defendants rely on that provision of the Rule to support their claim that the issue of probable cause has been conceded.

Plaintiff has filed a Motion For Leave to Withdraw Admissions, pursuant to Fed.R.Civ.P. 36(b), asserting a number of difficulties in obtaining the Plaintiff's signature on the responses to the admission requests due to the fact that he remains living in Mexico. Following the filing of that motion, Plaintiff did supplement the filing with a signed set of responses to the requests. In those responses, he denies that probable cause existed for his arrest.

There are two reasons why the court will allow the Plaintiff to withdraw the admissions which, by rule, were deemed admitted when no timely response was served. First, asking the Plaintiff to admit that probable cause existed in a request for admission is asking him to admit a legal conclusion. *See Beck v. State of Ohio*, 379 U.S. 89, 96 (1964). It is not a proper use of a request for admission to seek the admission of a legal

conclusion.  *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc.,* 130 F.R.D. 92, 95-96 (N.D.Ind. 1990).  Furthermore, it would not promote the presentation of the merits of this dispute for the court to simply grant summary judgment based upon an involuntary admission of a legal conclusion.  The court has the discretion to allow withdrawal of an admission where doing so better serves the presentation of the merits of a matter.  *Banos v. City of Chicago,* 398 F.3d 889, 892 (7th Cir. 2006).  Accordingly, the court grants Plaintiff's Motion For Leave to Withdraw Admissions.

Although Plaintiff is no longer deemed to have admitted that probable cause existed for his arrest, the court is convinced that, as a matter of law, probable cause did exist.  That conclusion is relatively easy to reach in light of the fact that whether or not probable cause existed is measured by the totality of circumstances at the time of the arrest, not on the basis of what is subsequently discovered or learned after the arrest. *Fisher v. Wal-Mart Stores, Inc.,* 619 F.3d 811, 816 (8th Cir. 2010).

At the time of the arrest, the officers were aware that the medical professionals with whom Detective Buckner had spoken were of the opinion that the injuries sustained by Vanesa were not consistent with a single fall.  Remember, it was a social worker at the hospital who called the police after receiving information on the suspicious nature of the injuries suffered by Vanesa.  The autopsy report stated that the manner of death was homicide and neither Detective Buckner nor Officer Torres had the medical expertise or

other strongly contraindicating facts which would have caused them to doubt Dr. Harshbarger's conclusion, which conclusion was also consistent with what the medical personnel at the hospital had opined. Elena and the Plaintiff appeared to have been the only two persons at the scene capable of inflicting a blow hard enough to have caused the severe swelling of Vanesa's brain. Plaintiff was intoxicated when the detective arrived and Buckner found out that he had lied not only about who he was, which might be consistent with simply trying to avoid detection as an undocumented alien, but also lied about where he was when the incident occurred. Though Elena lied about who Plaintiff was, she was the person who contacted the Vanesa's mother and accompanied them to the hospital, which would tend to push the focus back on the Plaintiff. The police had every right to be suspicious of Plaintiff's involvement in the incident even before conducting further interviews.

That brings the court to the interview of Elena by Officer Torres, where he utilized questions suggested by Detective Buckner. Plaintiff refers to the admission by Elena during the course of that interview as the sole piece of evidence linking Plaintiff to Vanesa's injuries. While Elena's statement that she saw Plaintiff hit Vanesa may be the sole piece of "direct evidence," it is not without supporting circumstantial evidence, as has been previously covered in detail. It is Plaintiff's contention that the transcript of that July 3, 2007, interview shows that Officer Torres threatened Elena so often with the possibility that she would go to jail and lose the opportunity to raise her soon to be born

child, that Elena did what anyone afraid of such an event would do - agree that Plaintiff had struck Vanesa. However, the transcript does not show an attempt to coerce or threaten. It is true that the officers were unequivocally persistent. But keep in mind, the autopsy report from that same day indicated that Vanesa was the victim of a homicide, and the only two persons known to have been on the scene and capable of administering blows sufficient to inflict such severe injuries were Elena and Plaintiff.

A reading of the interview transcript in its entirety shows that during its course, more often than not, the officers were attempting to empathize with Elena about her pregnancy and the circumstance they believed she was thrust into as a result of her boyfriend's drunken actions. They continually encouraged her to tell them the truth about what had happened and not to be afraid of any reprisals from Plaintiff or others. Even more importantly, one can listen to the audio of the interview, without understanding Spanish or following along by reading the transcript, and discern concern in Officer Torres' voice when questioning Elena as opposed to any threatening or ominous tone. Simply put, Plaintiff has no basis to assert that when Elena indicated she saw Plaintiff strike Vanesa, she was coerced into doing so, and her eyewitness account gave Defendants ample evidence of probable cause to arrest Plaintiff.

That leaves Plaintiff's claim of malicious prosecution. To state a claim for malicious prosecution under Section 1983, a plaintiff must demonstrate that: (1) the state

law requirements for a malicious prosecution claim are satisfied; (2) the malicious prosecution was committed by state actors; and (3) he was deprived of his liberty. *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir. 1996). In Indiana, a claim for malicious prosecution requires the proof of four elements: (1) that a defendant instituted or caused to be instituted a prosecution against the plaintiff; (2) that defendant acted with malice in doing so; (3) that the prosecution was instituted without probable cause; and, (4) that the prosecution terminated in the plaintiff's favor. *Butt v. McEvoy,* 669 N.E.2d 1015, 1017 (Ind.App. 1996).

The court has already determined that there was probable cause for Plaintiff's arrest. To succeed with a malicious prosecution claim, Plaintiff needs to show that Defendants took additional actions without probable cause which promoted his prosecution, such as maliciously attempting to influence prosecutors or knowingly making false or misleading statements. *Snodderly v. R.U.F.F. Drug Enforcement Task Force,* 239 F.3d 892, 901 (7th Cir. 2001). There is no evidence of such post-arrest conduct and, in fact, Plaintiff makes no argument to the contrary in his response brief. Consequently, the malicious prosecution claim must fail as well.

## Conclusion

For the reasons set forth in this entry, the court **GRANTS** Plaintiff's Motion For Leave to Withdraw Admissions (Docket # 112) and also **GRANTS** Defendants' Motion

For Summary Judgment (Docket # 108). A separate judgement shall issue in favor of the Defendants and against the Plaintiff.

**SO ORDERED** this 12th day of July 2011.

                                            RICHARD L. YOUNG, CHIEF JUDGE
                                            United States District Court
                                            Southern District of Indiana

Electronic Copies to:

M. Elizabeth Bemis
RUCKELSHAUS ROLAND
KAUTZMAN BLACKWELL & HASBROOK
meb@rucklaw.com

Susan E. Cline
LEWIS WAGNER LLP
scline@lewiswagner.com

Beth Ann Dale
CITY OF INDIANAPOLIS,
CORPORATION COUNSEL
bdale@indygov.org

Andrew R. Duncan
RUCKELSHAUS KAUTZMAN
BLACKWELL BEMIS & HASBROOK
ard@rucklaw.com

Jennifer Lynn Haley
CITY OF INDIANAPOLIS,
CORPORATION COUNSEL
jhaley@indy.gov

John F. Kautzman
RUCKELSHAUS KAUTZMAN
BLACKWELL BEMIS & HASBROOK
jfk@rucklaw.com

Geoffrey C. Lambert
LEWIS WAGNER LLP
glambert@lewiswagner.com

Rafael Ramirez
RAMIREZ LAW OFFICE
ramirezlaw@aol.com

John C. Ruckelshaus
RUCKELSHAUS KAUTZMAN
BLACKWELL BEMIS & HASBROOK
jcr@rucklaw.com

Cory Christian Voight
INDIANA OFFICE OF THE ATTORNEY GENERAL
cory.voight@atg.in.gov